1
2
3
4
5
6
7
8
9

**FILED**

Jun 04 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

10          UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION
                   3:20-MJ-70705 JCS

13

| UNITED STATES OF AMERICA, | ) | AFFIDAVIT OF FBI SPECIAL AGENT JAMES A. |
| | ) | FOLGER IN SUPPORT OF CRIMINAL |
| Plaintiff, | ) | COMPLAINT |
| | ) | |
| v. | ) | ███████████ |
| | ) | |
| BALMORE HERNANDEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT
FILED UNDER SEAL

# TABLE OF CONTENTS

I.     INTRODUCTION AND AGENT QUALIFICATIONS ....................................................1

II.    COUNT 1: BRIBERY OF LOCAL OFFICIAL (18 U.S.C. §§ 666 (a)(2) AND 2)......................3

III.   APPLICABLE LAW .......................................................................................................4

IV.    FACTS ESTABLISHING PROBABLE CAUSE ...........................................................5

       A.     Individuals...........................................................................................................5

       B.     Overview..............................................................................................................6

       C.     Corrupt Intent to Influence NURU in Connection With City Business...............................7

       D.     Bribes in Connection with Asphalt Plant Project ...........................................12

       E.     The Tractor........................................................................................................23

       F.     The January 27, 2018 Bribe .............................................................................26

V.     CONCLUSION...........................................................................................................28

VI.    REQUEST FOR SEALING........................................................................................28

AFFIDAVIT                                                    i

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James A. Folger, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state the following:

## I.      INTRODUCTION AND AGENT QUALIFICATIONS

1.      I submit this affidavit in support of a criminal complaint against Balmore HERNANDEZ. As set forth below, there is probable cause to believe HERNANDEZ bribed Mohammed NURU, the former Director of San Francisco Public Works, in violation of Title 18, United States Code, Section 666(a)(2).

2.      I am a Special Agent of the FBI and have been so employed since entering the FBI Academy in August 2012.  I am sworn and empowered to investigate criminal activity involving violations of federal law.  I am currently assigned to FBI's San Francisco Division Public Corruption Squad, which investigates abuse of public office in violation of criminal law, which includes fraud, bribery, extortion, conflicts of interest, and embezzlement. My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records. Additionally, I received *juris doctor* and Master of Business Administration degrees from the University of San Francisco in 2012.

3.      During my employment with the FBI, I have received formal classroom and field training at the FBI Academy in Quantico, Virginia and graduated from the New Agent Training Program.  My training and experience includes, but is not limited to: public corruption, fraud against the government, drug trafficking, gangs, organized crime, and RICO investigations.  I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's Office and other federal agents who have done extensive work in the areas of financial crimes and public corruption.  I have participated in several investigations involving public corruption, bribery, and fraud, and I have been the lead agent on several of those cases. I have worked on multiple wiretaps while investigating public corruption and criminal gangs. I have received formal training in wiretaps at the FBI academy in Quantico, Virginia as well as on the job training while working on wiretaps in active

investigations. I have also received training on phone records and cell tower analysis from members of the Cellular Analysis Survey Team (CAST) and have used this knowledge in numerous investigations.

4.      To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to: physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources. I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio and audio/video recording devices.

5.      I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources, among others:

       a.   my experience investigating honest services wire fraud, bribery, and other illegal activity relating to public corruption;

       b.   oral and written reports about this investigation that I have received from members of the FBI;

       c.   physical surveillance conducted by the FBI, the results of which have been reported to me either directly or indirectly;

       d.   information obtained from undercover agents;

       e.   recorded conversations; and

       f.   confidential human sources.

6.      Because this affidavit is being submitted for the purpose of establishing probable cause in support of the requested Complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.  Rather, I have set forth only those facts I believe are necessary to establish probable cause and to provide the Court with an overview of the facts that establish HERNANDEZ's pattern of corrupt conduct and intent to influence or reward NURU in connection with a transaction or series of transactions with the City and County of San Francisco that involved $5,000 or more.

7.      Unless otherwise indicated, where actions, conversations, and statements of others are described below, they are related in substance and in part. In addition, unless otherwise noted, wherever

1   in this Affidavit I assert a statement was made, the information was provided by another FBI agent, law

2   enforcement officer, recording, or witness who may have had either direct or hearsay knowledge of that

3   statement and to whom I or others have spoken, or whose reports I have reviewed.

4         8.     The conversations I summarize below were derived in large part from various intercepted

5   communications.  Collectively, these communications were documented in FBI reports and summaries.

6   These reports and summaries describe recorded conversations involving subjects of the investigation,

7   during which the subjects at times use code words and/or cryptic language to disguise conversations

8   about their criminal schemes and related activities.  The reports are summarized based on agents'

9   interpretations of the conversations. Some of these reports and summaries contain interpretations of

10   coded words, cryptic language, and vague identifiers.  It may be that subsequent review of the recorded

11   conversations and verbatim transcripts may show changes from the summaries initially prepared.

12   Quotations from the recordings are based on informal transcriptions of portions of certain key

13   recordings, which may not be exactly the same as formal transcriptions that are later prepared.

14   **II.     COUNT 1: BRIBERY OF LOCAL OFFICIAL (18 U.S.C. §§ 666 (a)(2) AND 2)**

15         9.     At all times material to this Complaint, the City and County of San Francisco ( also

16   referred to below as the "City"), was a local government that received federal assistance in excess of

17   $10,000 during a one-year period within twelve months before or after January 27, 2018.[1]

18         10.    At all times material to this Complaint, Mohammed NURU was the Director of Public

19   Works (DPW) for the City and County of San Francisco. Based on publicly available data, the total

20   DPW budget regularly encompassed hundreds of millions of dollars. As Director, NURU had great

21   influence over contracts and construction projects granted by DPW.  He also had significant influence

22   with other City departments.[2]

23

---

24      [1] According to the Budget and Appropriations Ordinance passed by the Board of Supervisors on

25   July25, 2017, for the Fiscal Year ended June 30, 2018, 5.1% of all funds appropriated for use by City departments came from federal funding, a total in excess of $400 million.  This included $55 million in federal grant money passed-through to DPW.  Federal funding also constituted 5.1% of the City's

26   general fund, a total in excess of $260 million. *See* File No. 170653, Ordinance No. 156-17 (Budget and Appropriation Ordinance) (available at https://sfbos.org/ordinances).

27      [2] While still serving as Director of DPW, NURU was charged by Criminal Complaint with

28   Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020, and by a separate Criminal Complaint with False Statement in violation of 18 U.S.C. § 1001 on January 28, 2020.

AFFIDAVIT         3

████████████████

11.     On or about January 27, 2018, in the Northern District of California, Balmore HERNANDEZ did corruptly give, offer, and agree to give a thing of value to NURU, namely over $50,000 in materials for NURU's vacation home, intending to influence and reward NURU in connection with a transaction and series of transactions of the City and County of San Francisco involving $5,000 or more.

12.     As described below, this bribe was part of a much larger pattern and course of conduct in which HERNANDEZ and his business associates repeatedly provided items of value to NURU, intending to influence and reward NURU in connection with his help steering City business their way or otherwise resolving issues HERNANDEZ and his associates encountered in connection with City contracts and approvals.

## III.    APPLICABLE LAW

13.     Title 18, section 666(a)(2), prohibits bribery of local officials who are agents of an organization receiving federal funds.  The elements of the offense include the following:

    a.    A person was an agent of an organization, a state, local or tribal government, or an agency of a state, local, or tribal government.[3]

    b.    The organization, state or local government received federal assistance in excess of $10,000 in a one-year period.

    c.    The one-year period of federal assistance was within twelve months before or after the commission of the offense.

    d.    The defendant gave, offered, or agreed to give a thing of value to any person.

    e.    The defendant intended to influence or reward the agent of the organization or agency in connection with a transaction or series of transactions of the organization or agency that involved $5,000 or more.

    f.    The defendant acted corruptly.

14.     Title 18, United States Code, Section 2, provides that "[w]hoever commits an offense

---

[3] "Agent" is defined in 18 U.S.C. § 666(d)(1). An "agent" need not have direct authority over the day-to-day decisions; "general authority" to act for the agency and control its funds is sufficient. *See, e.g.*, *United States v. Shoemaker*, 2014 WL 1226719 (5th Cir. Mar. 25, 2014); *see also United States v. Fernandez*, 2013 WL 3215461 (1st Cir. June 26, 2013) (state legislator).

AFFIDAVIT                                    4

against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

15.     The bribe need not be completed or successful. *See United States v. Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019) (liability for bribery of a public official, in violation of 18 U.S.C. § 201(b)(2)(A), "does not depend on an outcome; the offense is complete at the moment of agreement, and that agreement need not even be accompanied by the bribe recipient's genuine intentions to follow through.").

16.     In addition, "[i]n order to obtain jurisdiction of a defendant under section 666, the government need not prove that the funds actually stolen by the defendant were of federal origin. So long as the [official] is an agent of an organization that receives more than $10,000 in federal benefits in any given year, it is not necessary that the particular funds stolen be among those 'benefits.'" *United States v. Wyncoop*, 11 F.3d 119, 122 (9th Cir. 1993).  *See also Sabri v. United States*, 541 U.S. 600, 605–06 (2004) (funds subject to abuse by bribed agent need not be traceable to federal funds)

17.     Nor does the government need to show "that the defendant intended for his payments to be tied to specific official acts (or omissions). Bribery requires the intent to effect an exchange of money (or gifts) for specific official action (or inaction), but each payment need not be correlated with a specific official act." *See United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). The requirement of the statute is satisfied "so long as the evidence shows a 'course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor.' *Id.* (citation omitted). Payments may be made "with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." *Id. See also United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007); *United States v. Menendez*, 291 F. Supp. 3d 606, 613 (D.N.J. 2018). [4]

## IV.     FACTS ESTABLISHING PROBABLE CAUSE

### A.     Individuals

---

[4] Other courts, including the Ninth Circuit, have held that bribery under 18 U.S.C. § 666 does not require a quid pro quo. *See United States v. Garrido*, 713 F.3d 985, 996 (9th Cir. 2013) (citing *United States v. McNair*, 605 F.3d 1152, 1187–89 (11th Cir.2010)).

18.     HERNANDEZ is the CEO and Vice President of AzulWorks, Inc. (AzulWorks), which has received numerous contracts with the City and County of San Francisco, including contracts with DPW in 2018 worth millions of dollars. Prior to forming AzulWorks, Inc., HERNANDEZ was a longtime employee of DPW. I have learned over the course of this investigation that NURU and HERNANDEZ have a close relationship.  They were in frequent contact during the relevant time periods described below.

19.     CONTRACTOR 3 and CONTRACTOR 4 are associates of HERNANDEZ and the owners of a separate construction engineering firm based in the Bay Area that is focused on government contracts.  CONTRACTOR 3 and CONTRACTOR 4 are also business partners or have interests in a number of construction and engineering related businesses. Their firms have performed work on a number of projects for the City and County of San Francisco.

**B.     Overview**

20.     Agents have intercepted and/or reviewed multiple communications concerning items of value given to NURU by HERNANDEZ in exchange for NURU's assistance with HERNANDEZ's business with the City.  HERNANDEZ's bribery scheme focused heavily on NURU's vacation home in Northern California on Lodoga Stonyford Road in Stonyford. [5]  The home, which NURU and HERNANDEZ often referred to as the "ranch," appears to have been built from scratch by contractors largely from San Francisco or the Bay Area. HERNANDEZ paid for and provided a substantial portion of the labor and materials to build the house and improve the property (which consists of two adjacent 10-acre parcels).  Based on my review of intercepted communications and records from AzulWorks, Inc., I estimate that between late 2016 and the end of 2018, HERNANDEZ supplied in excess of $250,000 in labor and materials to help NURU build the home and related improvements at the ranch.[6] The investigation has analyzed known financial accounts for NURU.  Although the investigation

---

[5] Although the home is technically located in Stonyford, intercepted communications show that NURU and other subjects often refer to the vacation home as being in "Ladoga" or "Lodoga" (Lodoga, CA is next to Stonyford, CA).  For purposes of this affidavit, I use both Stonyford and Lodoga to refer to NURU's vacation home/ranch.

[6] This number does not include a tractor and related attachments (described below) that HERNANDEZ and others helped provide NURU in February 2019.  Based on my review of business records and publicly available data, I believe the tractor and attachments delivered to NURU in February 2019 are worth in excess of $40,000.

identified more than $200,000 that NURU spent on home improvement (between approximately January 2017 and May 2019), no payments to HERNANDEZ or AzulWorks have been identified. Other items of value HERNANDEZ provided (or helped arrange for NURU) include a hotel stay in January 2020 valued at over $2,000 and a number of lavish dinners often costing in excess of $1,000 per meal.

21.    In addition to using bribes to influence and reward NURU's actions for the benefit of AzulWorks, HERNANDEZ was also using the bribes to influence and reward NURU for assistance with other business ventures beyond AzulWorks. The investigation has revealed HERNANDEZ was an integral part of a scheme to bribe NURU to win a contract through DPW to operate an asphalt plant on land owned by the Port of San Francisco. As a result, I believe the benefits provided to NURU by HERNANDEZ were also provided to influence and reward NURU in connection with the asphalt plant deal, an effort which lasted years and was still ongoing until NURU's arrest.

22.    It was against this backdrop that HERNANDEZ provided much of the labor and materials for NURU'S ranch property while CONTRACTOR 4, who had a significant stake in the asphalt plant deal, paid for extravagant dinners and provided or reimbursed HERNANDEZ for some of the materials purchased for NURU's ranch, including a tractor and attachments valued in excess of $40,000.  Based on my review of business records, the tractor appears to have been financed through one of CONTRACTOR 3 and CONTRACTOR 4's companies.  HERNANDEZ and CONTRACTOR 3 then arranged delivery of the tractor to a very appreciative NURU in February 2019.

C.    **Corrupt Intent to Influence NURU in Connection With City Business**

23.    On January 27, 2020, another FBI agent and I interviewed HERNANDEZ at his home in Burlingame, CA.  HERNANDEZ confirmed he had known NURU for fifteen to twenty years and they talked several times per month, including on the previous day. HERNANDEZ stated he first met NURU while working at DPW.  HERNANDEZ had worked at DPW as a civil engineer for 24 years before leaving for the private sector.  HERNANDEZ then made the following false and misleading statements, among others, which I believe provide evidence of HERNANDEZ's consciousness of guilt and corrupt intent:

      a.    HERNANDEZ said he had not done any construction work on NURU's vacation home in Lodoga.

b. HERNANDEZ claimed his assistance with the vacation home was "as a friend," and had been limited to reviewing construction plans and paying two invoices – one for approximately $10,000 worth of lumber and the other for approximately $10,000 of electrical work.

c. HERNANDEZ claimed he did not expect anything in return for his assistance.

24. These statements were each false or highly misleading. Based on my review of time sheets and copies of checks from AzulWorks, HERNANDEZ paid more than $100,000 for labor at NURU's Lodoga property between at least as early as December 2016 and September 2018. His work crews often spent multiple days or weeks at a time working on the property. I have also reviewed dozens of text messages between NURU and HERNANDEZ over the same period of time where the two exchanged photos and other updates about the progress of the work on NURU's vacation home. Records provided by AzulWorks further indicate HERNANDEZ spent more than $100,000 on materials for NURU's ranch, including tiles, stone, doors, windows, and PVC pipe. According to AzulWorks receipts, HERNANDEZ spent more than $35,000 on windows alone, and close to $10,000 on patio doors for NURU.

25. HERNANDEZ's claim that he expected nothing in return from NURU is contradicted by his own communications with NURU. For example, on April 14, 2017, during a trip to China, NURU texted HERNANDEZ a photo. NURU wrote "Getting ready to start heading home. How are you? Picture is me getting watered down with blessings of good luck in the new year. Greetings to everyone. Thanks." HERNANDEZ replied, "Bring me some blessings. I need some jobs."

26. At the same time HERNANDEZ was texting "Bring me some blessings. I need some jobs," AzulWorks had a crew at NURU's ranch in Lodoga. Company records show AzulWorks issued a check on the same day of the text, for $5,802, to cover work performed for NURU. On April 21, 2017, AzulWorks issued two more checks, totaling $15,191.25, for work on the ranch. The corresponding time sheet shows the payment covered a team of eleven workers who logged hours between April 10 and April 15, 2017.[7]

---

[7] Based on my training and experience, I believe the payment was split into two parts to bring the amount under $10,000 to avoid bank reporting requirements and potential scrutiny from government

AFFIDAVIT                                              8

27.     Given HERNANDEZ's April 17, 2020, request that NURU bring him "some blessings" in the form of jobs, I believe HERNANDEZ was providing hundreds of thousands of dollars in labor and materials for NURU's vacation home so NURU would direct City contracts to HERNANDEZ or otherwise use his official position to help HERNANDEZ with existing and future business with City contracts or approvals.  This stands in stark contrast to HERNANDEZ's claim to the FBI that he did not expect anything in return from NURU for his assistance.

28.     Similarly, on February 21, 2017, HERNANDEZ texted NURU:

> "I am at Home Depot working on your windows
>
> And doors
>
> Lots of work"

Then, on February 28, 2017, HERNANDEZ texted with NURU:

> BH:     The guys are working up there now Keep working on the wood.
>
> NURU: Thank you
>
> BH: I will need a favor from you this week
>
> MN: For sure
>
> BH: Maybe we can meet today after work

29.     Copies of checks and time sheets from AzulWorks show crews were on-site at NURU's Lodoga property for almost the entire month of March 2017.

30.     In addition, on March 18, 2017, NURU texted pictures of the framing of his house to HERNANDEZ.  On March 21, 2017, HERNANDEZ texted NURU that he did not get a certain job in connection with new mixed-use office space being built to be used in part by City departments.  NURU responded that he would handle it.  The text exchange went as follows:

> BH: We did not get the 1500 mission job
>
> MN: Oh no. That's not good. Did they say why you didn't get it.
>
> BH: They said that we were not the lowest number and a non LBE got it  I think they

authorities, which further underscores HERNANDEZ's efforts to conceal the corrupt nature of his dealings with NURU.  AzulWorks issued the checks to the same person on the same day – one for $8,000 and the other for $7,191.25.  Together the checks match the timesheet total for work performed at Lodoga between April 10, 2017 and April 15, 2017.

AFFIDAVIT                                          9

1    play games to go with someone they have a relationship with Time to move on

2    MN: I can handle them.

3    31.    1500 Mission Street is the site of a recently completed high-rise mixed use development

4    that has two components – a residential and retail development including a 39-story, 396 foot tall tower

5    at the corner of Mission Street and South Van Ness Avenue, and an office development and permit

6    center to be occupied by several City and County of San Francisco departments – including DPW –

7    consisting of a 16-story, 238-foot tall tower on 11th Street between Market and Mission Streets. *See*

8    https://www.buildgc.com/work/1500-mission/. In 2017 it was still in the early phases of construction

9    and DPW was heavily involved in the construction of the office space it would occupy.  I believe this

10   explains why NURU said he could "handle them" for HERNANDEZ.

11   32.    During a recorded phone call on September 14, 2018, NURU and HERNANDEZ discussed

12   discussed HERNANDEZ sending someone to work on the vacation home:

13    BH: So I'm meeting with [first name of one of HERNANDEZ's employees] in a little bit.

14    He's gonna be leaving here early afternoon like at 2 o'clock so he can go there, ah

15    Sacramento, pick up some equipment. He may not be. He UI for you tonight, not gonna

16    do much. I'll give him some money so he can maybe go to dinner at casino you know so

17    he can enjoy a little bit and then um, and then tomorrow um, he is gonna be there first

18    thing in the morning with you so you guys can work on this.

19    MN: Okay, okay let me know if he needs anything from me. Give him my number,

20    whatever he needs…

21   33.    Immediately after talking about the logistics of the work on the Lodoga property,

22   HERNANDEZ asked NURU for assistance on what appears to be a City related issue or project, saying:

23   "Sounds really good, so, hey, um, keep in mind that, you know, the property with [street in San

24   Francisco], right, that piece of land there, right so if you can do something." NURU interrupted and said

25   "[Y]eah um [DPW EMPLOYEE 1], has been in jury duty this whole week, so he hasn't been here, but

26   he is working on that for me to figure out how we can make it all clean and legit and yeah, so there is no

27   long-term problem." HERNANDEZ responded "Perfect, perfect, perfect, okay Mo…thank you man."

28   34.    During the same call, NURU and HERNANDEZ discussed the fish NURU caught during

a recent fishing trip to Alaska. Recorded communications show NURU provided fish he caught to many of his friends and colleagues, including HERNANDEZ and his family. NURU said he received a nice note from HERNANDEZ's wife, and that "she loved the fish." The following exchange then took place:

> BH: told his wife "don't get used to this because that is the most expensive fish by the pound" and laughed.
>
> MN: laughed in response and said: "not including the person that caught it" and laughed again.
>
> BH: Yeah, shit.

HERNANDEZ then told NURU how expensive it was for him to bring back fish from his own fishing trip in Mexico.

35. NURU also called HERNANDEZ on September 26, 2018. During the call, HERNANDEZ again asked NURU for help, this time with a denied City approval on one of his jobs. HERNANDEZ said, "Hey, so I sent you an e-mail on the other e-mail. Um, that...tha...[construction company] is working on the job on Van Ness. And the... And, there were three hearings. [Unintelligible] I need to cut. I'm doing the side work. And the, and the, and you know the sidewalks. And the [UI]. It's significantly, it's a little different so they're putting in all new trees similar size everything. But they denied the removal of the trees at the hearing and I uh send you the paperwork, you know." NURU then asked for the address and HERNANDEZ continued by providing an address and said "And, um, so I send it to you. See if you could take a look at and see if there's something can help out with." NURU responded, "Okay, let me look at it."

36. I have reviewed a copy of an email from HERNANDEZ to NURU's private email address which was sent on the same day. Attached to the email is a Public Works order (issued in the name of the Director) denying the removal of two trees adjacent to an address on Van Ness and scheduling a public hearing on the appeal. It also includes diagrams and photos of the site. I believe the email makes clear that during the September 26th call, HERNANDEZ was asking NURU for help appealing an adverse DPW order. Around the same time, records from AzulWorks show that two employees were paid a total of approximately $1,500.00 on September 28, 2018, for recent work on NURU's Lodoga property.

37.     Similarly, on March 20, 2019, HERNANDEZ texted NURU a letter "Failure to Provide Access" and asked "Can you please make this fine go away."

38.     NURU called HERNANDEZ the same day.  During the recorded call HERNANDEZ told NURU that he was having a problem with a DPW contract and a store owner that was forced to close during HERNANDEZ's construction. NURU, said, "The way to work it is to go to the appeal first… So, because now that it is in text and everything, I have to kind of follow the process. You can't put it, once you make it a document like that, you put me in a situation I can't…"  HERNANDEZ interjected "So, we'll put in an appeal then. Okay?" and NURU replied "They should go to the appeal. And then let me know when the appeal is, I will try and, you know I can talk to the hearing officer to just see what can be done."  I believe this exchange evidences not only HERNANDEZ's corrupt intent – asking NURU to make a fine go away – but also NURU's concerns about avoiding detection of his official action.

**D.     Bribes in Connection with Asphalt Plant Project**

39.     The investigation has revealed that at least as early as 2013, HERNANDEZ and a business associate, CONTRACTOR 4, began planning to use HERNANDEZ's relationship with NURU to win a contract through DPW to operate an asphalt plant on land owned by the Port of San Francisco.

40.     For example, in an internal email explaining expenses for accounting purposes, CONTRACTOR 4 wrote that an $812.10 charge at Morton's on February 8, 2013, was for "dinner with Mohammad head of DPW and Balmore HERNANDEZ discussing asphalt plant deal."

41.     On May 16, 2013, CONTRACTOR 4 expressed his appreciation for HERNANDEZ's efforts to date, writing: "I have used you to help negotiate this deal because of your ability to understand and present our proposal without making the other side nervous. For this you are entitled to ownership."

42.     Communications concerning the asphalt plant and NURU (via email, text, and phone) continued between CONTRACTOR 4 and HERNANDEZ from 2013 through at least 2019. CONTRACTOR 3, a business associate of both CONTRACTOR 4 and HERNANDEZ, was also involved in certain communications about the asphalt plant project and later helped deliver a tractor to NURU in February 2019. HERNANDEZ often took the lead in communicating with NURU and arranging dinner meetings with NURU, HERNANDEZ, and CONTRACTOR 4.

43.     In their communications, HERNANDEZ and CONTRACTOR 4 usually referred to

1   NURU only as "our friend," and the group appears to almost always have met at the same restaurant in

2   San Mateo (RESTAURANT 1). Based on credit card statements, text messages, and recorded phone

3   calls, the dinner meetings appear to have occurred for a number of years, at times on what appears to be

4   almost a monthly or bi-monthly basis.

5        44.    By the end of 2013, email and text communications between HERNANDEZ,

6   CONTRACTOR 4, and NURU indicate NURU was providing inside information on how DPW and the

7   Port of San Francisco ("Port") were approaching a Request for Qualifications/Proposals (RFQ-P or

8   RFP) for the asphalt plant on Port land.

9        45.    For example, on October 3, 2013, NURU forwarded an internal DPW email about the

10  carbon impact of the contemplated asphalt plant from his work account to his personal email account.

11  Three days later he then sent it to HERNANDEZ from his personal email account and added "This may

12  interest you."   HERNANDEZ forwarded the email three minutes later to CONTRACTOR 4 writing

13  "Fyi There is also a company in San Jose proposing cold asphalt paving. We need to address both if [sic]

14  these issues in our proposal."

15       46.    On December 11, 2013, HERNANDEZ sent CONTRACTOR 4 an email re "Asphalt

16  RFP" and wrote:

17              This DRAFT is very close to the final product but it has substantial
                changes from the previous version that may not be in our best interest.

18              Let's review it carefully, and provide a page by page commentary for the
                changes we need to implement. For example, this RFP makes reference to

19              the City Standards for mix designs which in turn makes reference to
                CALTRANS RAP percentages which are much lower than we had

20              discussed. Let's put together a schedule for getting back to them with
                comments

21

22       47.    I believe this email contained an internal draft RFP from DPW about the asphalt plant

23  that had not yet been publicly released.

24       48.    The following day, CONTRACTOR 4 responded to the December 11, 2013 email with

25  concerns about the proposed site and other items.  HERNANDEZ responded "We need to print the RFP

26  on paper and get together and mark it up with our corrections or changes that we want made. The RFP is

27  incorrect with the site as our friend still want us at the site we discussed. Let me know when we can

28  meet."

AFFIDAVIT                               13

49.     On January 2, 2014, HERNANDEZ forwarded what appeared to be another internal City email (subject "FW: Latest Draft of Request for Proposals and Memorandum of Understanding for Asphalt and Concrete Production Lease Opportunity") to CONTRACTOR 4.  HERNANDEZ wrote "Attached is the latest DRAFT for our review and comments."

50.     On January 6, 2014, CONTRACTOR 4 responded with concerns about the amount of security being demanded by the City. "They need to give us a guaranty sale of quantity for asphalt and concrete. If they can ask for this kind of security I would hope they can offer something in return." HERNANDEZ responded to that email by suggesting a meeting with their "friend" and again referencing the need to print out the RFP: "We need to set up a meeting with our friend to let him know our concerns and propose to eliminate those security requirements. Just print the RFP and I will set up a meeting, let me know your availability this week."

51.     Later in March, on March 20, 2014, HERNANDEZ texted CONTRACTOR 4:

BH: "Do we still need to meet with Mohammed?"
CONTRACTOR 4: "Yes ASAP
BH: "Mtg confirmed for 6 pm"

52.     CONTRACTOR 4 then provided the address of RESTAURANT 1 in San Mateo.  Credit Card statements for CONTRACTOR 4 reflect a charge at RESTAURANT 1 for $667.66 on March 20, 2014.

53.     Based on the investigation and my training and experience, I believe CONTRACTOR 4 and HERNANDEZ were providing NURU with an expensive dinner in order to obtain his continued assistance with the asphalt plant and other City business.

54.     Roughly one month later, on April 15, 2014, HERNANDEZ texted CONTRACTOR 4: "We are getting a list of bidders for the asphalt plant and if we were 2nd, he will ask to call us for negotiations." On April 21, 2014, HERNANDEZ texted CONTRACTOR 4: "Please review the info on the asphalt plant and provide me with any comments. Take a look at the proposed lay-outs."

55.     By May 2014, CONTRACTOR 4 appeared to have felt increasingly confident that they would obtain the asphalt plant deal and that it would be profitable.  He also acknowledged the clandestine "back channel" nature of their efforts.  In a May 23, 2014 email to a work colleague, he wrote:

"the back channels of negotiating are in full swing for the candlestick phase 2. I need to send a PDF file of the asphalt plant and concrete plant to [well known business person]. This will be done through back channels from Mohammad. Could you send again to me for the 10th time our proposal for the plants, a PDF file excluding the financial performas. [sic] This will be forwarded through various ways to get to him this am.

Just so you know there was a a [sic] meeting last night that figured out the left hand needs to work with the right hand and two hands are better the one!!! Please keep this information between you and me. All deals can blow up. Loose lips sink ships.

It's not a done deal, keep your figures crossed this could be great for us"

56.     In the summer of 2014, HERNANDEZ also went on a trip to Africa with NURU, their families, and others. Email correspondence and invoices show HERNANDEZ paid for certain hotel rooms for the group, including NURU.[8]

57.     In the fall, communications increased concerning the asphalt plant.  On September 10, 2014, NURU emailed HERNANDEZ electrical plans for his Lodoga vacation property.  Then, on September 16, 2014, NURU forwarded an internal email from his work account to his personal account. He then forwarded the email ("Fwd: SW Environmental Analysis – Outcomes") from his personal account to HERNANDEZ, writing "Going to Port Commission in two weeks."  HERNANDEZ forwarded the email to CONTRACTOR 4, who replied the following day: "Thanks. I hope all of our efforts pay off some day. It seems that it is close."

58.     NURU appears to have met with HERNANDEZ and CONTRACTOR 4 again at RESTAURANT 1 on October 22, 2014. On October 20, HERNANDEZ texted CONTRACTOR 4:

BH: Our friend is available on Wednesday to meet for dinner, does it work for you?

CONTRACTOR 4: Yes absolutely [RESTAURANT 1] again??

BH: Yes I am with him now so it is confirmed.

59.     Credit card records show a charge on CONTRACTOR 4's credit card statement from RESTAURANT 1 on October 22, 2014, for $287.08.

60.     On November 20, 2014, HERNANDEZ sent CONTRACTOR 4 an internal City email chain between DPW and Port staff concerning the asphalt plant that ultimately went to NURU.  I believe

---

[8] It is unclear whether HERNANDEZ was later reimbursed by NURU.  NURU also appears to have paid for different rooms for the group during the trip.

1  HERNANDEZ obtained this email from NURU. Based on the email chain it appears NURU had asked

2  DPW employees for information on the asphalt plant on November 5, 2014. A DPW employee

3  responded to NURU the same day with a number of internal documents and also described various

4  specifications that were under consideration for the RFP. HERNANDEZ forwarded the email to

5  CONTRACTOR 4 with the message: "Here is the complete package fyi."  Attachments to the forwarded

6  email included an executive summary, draft RFP, appendices to the RFP, and a draft Memorandum of

7  Understanding between DPW and the Port.

8       61.    On December 16, 2014, NURU forwarded another internal DPW email about the asphalt

9  plant from his DPW account to his personal email, and then to HERNANDEZ.  The email concerned the

10  proposed site of the asphalt plant.

11       62.    On January 28, 2015, NURU sent HERNANDEZ an electrical layout plan for his Lodoga

12  property.  Two days later, on January 30, 2015, NURU forwarded an internal DPW/Port email (subject:

13  "RFQ/P with draft Port edits") from his work email to his personal email, then sent it to HERNANDEZ,

14  who sent it to CONTRACTOR 4.  HERNANDEZ wrote: "[P]lease review this FINAL DRAFT. As you

15  can see, the Port is moving to request authorization for DPW to issue the RFP. Mark it up with your

16  comments and lets meet early next week to discuss. Next week is our last chance to suggest changes."

17       63.    The attachment to the email was titled "DRAFT-Asphalt-Concrete-Production-Lease-

18  Opportunity-Request-For-Proposal....docx" and was originally forwarded by DPW staff to NURU and

19  others (after DPW staff received it from Port staff with the message "Attached please find the draft RFP

20  with proposed Port edits").

21       64.    On February 2, 2015, NURU again forwarded an internal DPW/Port email ("Form of

22  Asphalt and Concrete Batch Plant Transaction") from his work account to his personal email, then to

23  Balmore HERNANDEZ.  Within minutes, HERNANDEZ forwarded it to CONTRACTOR 4.  The

24  email described plans for the Port and DPW to enter into a transaction for a concrete and asphalt batch

25  plant. The originating DPW employee wrote to NURU and one other senior DPW employee: "Reference

26  e-mail below. After speaking with their attorney, below is what the Port feels works best. They would

27  handle the lease negotiations and lease; and public works would handle the supply contract. Currently,

28  they plan to go before the Port Commission on 2/10 to clear Item #1 approval.  If ok, I'll respond… and

provide a schedule."

65.     That same day, CONTRACTOR 4 forwarded the email to a work colleague.  After the colleague expressed concern about being fully prepared for the Port Commission meeting, CONTRACTOR 4 responded: "don't worry … this is set up for us to win."

66.     On February 5, 2015, NURU again forwarded an internal email to HERNANDEZ that he previously forwarded from his work account to his personal account. HERNANDEZ then forwarded it to CONTRACTOR 4. The email attached a redline draft memo of the February 10 Port Commission Staff Report concerning the asphalt and concrete facilities.  DPW staff had received it from Port staff and forwarded it to NURU and another senior DPW employee writing: "FYI…providing comments by the end of the day to the Port's memo to the Port Commission on the Asphalt and Concrete facilities (attached draft memo)." When forwarding the email, HERNANDEZ wrote to CONTRACTOR 4: "Review and call me or send me comments. We need to provide comments today by end of day."

67.     Four days later, on February 9, 2015, NURU emailed HERNANDEZ an invoice for electrical work performed at his Lodoga property for $10,244.44.  A balance of $5,244.44 remained outstanding according to the document.

68.     On February 10, 2015, the San Francisco Port Commission passed Resolution 15-07, which requested authorization for San Francisco Public Works, in consultation with Port staff, to issue a Competitive Solicitation for an Asphalt and Concrete Batching Plant at Seawall Lot 352 (located along Amador Street) with a Bulk Maritime Terminal Component at Pier 94.

69.     The RFP for the asphalt plant was issued by DPW on April 7, 2015.  It was later revised on May 13, 2015.

70.     On May 21, 2015, NURU placed a purchase order for a manufactured home from a company in Chico, CA.  The invoice listed a cost of $138,551.48 and an unpaid balance of $128,051.48 after the down payment.

71.     On or about June 16, 2015, four bids were submitted for the asphalt plant, including a bid from a joint venture involving CONTRACTOR 4's company.

72.     On August 3, 2015, text messages between HERNANDEZ and CONTRACTOR 4 indicated they were again planning to meet with NURU for dinner, who they referred to as their

"friend." HERNANDEZ texted "How about dinner with our friend this Wednesday. We are here together." CONTRACTOR 4 replied that Wednesday was good, and HERNANDEZ texted "We have some info to prep you. Same place at 7:30."

73.     Based on my training and experience, my review of other evidence in this investigation, and the context and timing of this communication, I believe NURU and HERNANDEZ were meeting with CONTRACTOR 4 to prepare him for an interview with the panel that was reviewing bids on the asphalt plant.

74.     Credit card statements for CONTRACTOR 4 show a charge of $394.07 at RESTAURANT 1 on Wednesday, August 5, 2015.

75.     The next day, on August 6, 2015, NURU sent HERNANDEZ a copy of the manufactured home purchase order (dated 5/21/15 and referenced above) from a company in Chico, CA for $138,551.48.  The unpaid balance after down payment was $128,051.48.  In the same email, NURU included related documents and an updated agreement with the same company, dated 8/1/2015, with a higher cost of $194,257.91.

76.     On August 11, 2015, at 8:16 AM, HERNANDEZ texted CONTRACTOR 4 "Good luck today!!!!!"

77.     On August 21, 2015, HERNANDEZ texted CONTRACTOR 4 "The scoring is done and it is all good." I believe this refers to the scoring performed by the panel on the bids for the asphalt plant and that NURU provided this information to HERNANDEZ before it was publicly available.

78.     Credit card statements for CONTRACTOR 4 and text messages between HERNANDEZ and CONTRACTOR 4 indicate they again met for dinner with NURU at RESTAURANT 1 on Tuesday, September 8, 2015. HERNANDEZ texted CONTRACTOR 4 on September 2, 2015: "Our friend will meet you on Tuesday at the same place at 7pm."  The total this time, according to CONTRACTOR 4's credit card records, was $547.84.

79.     Two weeks later, on September 22, 2015, the San Francisco Port Commission selected CONTRACTOR 4's joint venture as the most responsive bid and directed Port staff to enter into an Exclusive Negotiation Agreement with CONTRACTOR 4's joint venture.

80.     Based on my review of email communications and other records, I believe

CONTRACTOR 4's joint venture may not have been the most qualified bidder, and benefitted significantly (and intended to benefit significantly) from NURU's influence on the process in exchange for the items of value conferred on NURU by HERNANDEZ and CONTRACTOR 4.

81.     For example, in an email regarding the asphalt plant to CONTRACTOR 3, dated June 7, 2015 (nine days before final bids were submitted), CONTRACTOR 4 wrote "Why are we even involved? Because I've pursued this for 3 plus years and the deal is finally here[.] We Don't [sic] have the capital or the experience to do this deal but we are in the middle of it."  He concludes by asking for help thinking through who they should partner with on the deal.  CONTRACTOR 3 responded, "Let's talk about this. I want to make sure we do this for us and not for others. I also know we are shirt in [sic] cash and we also have not run an asphalt plant or concrete plant."

82.     On October 25, 2015, following the Port's September decision to enter into an Exclusive Negotiation Agreement with CONTRACTOR 4's joint venture, NURU texted HERNANDEZ pictures of the work completed at his Lodoga property and wrote: "Thanks so much for all the help this weekend. We definitely moved the project to another level. There's no way we could have gotten this far without your leadership. God will bless you and your family for your kindness."

83.     Text messages between HERNANDEZ and CONTRACTOR 4 and credit card receipts indicate they met with NURU again at RESTAURANT 1 on November 5, 2015.  The November meal cost $394.34.

84.     There was another dinner at RESTAURANT 1 in December.  On December 22, 2015, HERNANDEZ texted CONTRACTOR 4: "Our friend would like to meet, let me know when you are available." CONTRACTOR 4 replied and agreed to meet at 7:00 "at the same place" the following day.

85.     The following day, December 23, 2015, CONTRACTOR 4 texted HERNANDEZ: "I'm here we have a booth tonight important !!! Bottle of opus ready when our friend is here !" Credit card statements show a charge to CONTRACTOR 4 from RESTAURANT 1 of $475.85.

86.     An entry on NURU's calendar, titled "Asphalt RFQ/P Update & Presentation," indicates he met at City Hall with CONTRACTOR 4 and other principals from the joint venture, DPW, and the Port, to discuss the asphalt plant a few weeks later, on January 19, 2016.

87.     On February 23, 2016, the Port Commission formally adopted an exclusive negotiation

agreement with CONTRACTOR 4's joint venture.

88.     On June 10, 2016, CONTRACTOR 4 emailed a business contact about his relationship with NURU, writing "we currently do not have any contracts with DPW. We are negotiating with DPW for supply contracts for the new asphalt plant. I have a very close relationship with Mohammad Nuru. I can call him or visit his office on any given moment or day."

89.     Text messages and credit card statements show the group again met for dinner at RESTAURANT 1 on August 11, 2016.  The charge to CONTRACTOR 4 was $367.33.

90.     On November 22, 2016, texts and credit card statements show CONTRACTOR 4 and HERNANDEZ met for dinner in "the back private room" at RESTAURANT 1.  Based on the pattern described above, I believe NURU was with them.  The charge to CONTRACTOR 4's credit card for this meal was $519.78.

91.     Text messages between HERNANDEZ and CONTRACTOR 4 and credit card receipts indicate expensive dinners with NURU at RESTAURANT 1 continued as negotiations on the asphalt plant among DPW, the Port, and CONTRACTOR 4's joint venture stretched on for years without resolution.[9]

92.     In 2017, the meals appear to have gotten much more expensive.  As noted above, on April 14, 2017, during a trip to China, NURU texted HERNANDEZ a photo.  NURU wrote "Getting ready to start heading home. How are you? Picture is me getting watered down with blessings of good luck in the new year. Greetings to everyone. Thanks."  HERNANDEZ replied, "Bring me some blessings. I need some jobs."

93.     Ten days later, on April 24, 2017, HERNANDEZ texted CONTRACTOR 4: "Our friend is back from his trip. Let me know when you are available to meet." CONTRACTOR 4 responded, "Set it up next week."

94.     On May 16, 2017, CONTRACTOR 4 texted HERNANDEZ: "Any luck for dinner?" in the ensuing exchange of messages the two agreed to meet Thursday at 7:30.  HERNANDEZ texted NURU the same day: "Dinner Thursday at 7:30."  Credit card records for CONTRACTOR 4 show a

---

[9] Additional investigation revealed that, following NURU's January arrest and resignation, DPW and the Port scrapped their plans for the asphalt plant.

1    charge from RESTAURANT 1 dated Thursday, May 18, 2017, for $1,075.27.

2        95.    Another exchange of text records showed a July 20, 2017 meeting between

3    HERNANDEZ and CONTRACTOR 4 at RESTAURANT 1, which I believe – based on the pattern over

4    several years described above – also included NURU.  After arranging the meeting by text message on

5    July 10, 2020, a message from CONTRACTOR 4 to HERNANDEZ stated "Confirming tonight?"

6    "Chipino [sic], lamb chops, sea base or baby back ribs?"  Credit card records show a July 20, 2017

7    charge from RESTAURANT 1 to CONTRACTOR 4's credit card in the amount of $1,033.85.

8        96.    On July 26, 2017, HERNANDEZ texted NURU:

9            BH: Can you check on the reading last night

10           MN: Working on it now

11           BH: No news?

12           MN: Continued to September and we will be trying to work on getting language to
             protect the developers interest. what the board is wanting is is a public process to appeal.

13           BH: Thanks

14

15       97.    As noted above, negotiations between DPW, the Port, and the joint venture regarding the

16   supply contract and other issues remained ongoing and unresolved through early 2020.

17       98.    On August 5, 2017, HERNANDEZ texted CONTRACTOR 4:

18           BH:    Our friend's window and door order is ready to process. Let me know if you
                    would like to process directly. It has a job number only

19

20           C4:    Best way let's meet up Monday

21           BH:    I won't be in town until next Sunday
                    But let's meet the following Monday
                    Thanks

22

23           C4:    Okay
                    Wednesday that week I'm out Monday Tuesday

24           BH:    Ok let's meet at our spot for 7:30
                    Thanks

25

26           C4:    Got it

27       99.    Business records show that on August 25, 2017, HERNANDEZ spent $47,020.45 on

28   patio doors and Andersen windows at Home Depot. This expenditure appears to have followed another

expensive dinner with NURU and CONTRACTOR 4 at RESTAURANT 1.

100.     On August 16, 2017, CONTRACTOR 4 texted HERNANDEZ to let him know that he could not make the meeting. The two then decided to change it to the following Monday, with HERNANDEZ writing "Our friend prefers Monday."  The same day, HERNANDEZ texted with NURU: "[CONTRACTOR 4] needs to reschedule to next week Monday Tuesday or Wednesday" and then later "We are set for Monday."  The following Monday was August 21, 2017.

101.     On August 21, 2017, CONTRACTOR 4 texted HERNANDEZ to confirm the 7:30 dinner.  He then wrote: "Balmore specially [sic] How do they guarantee the payment of the deficiency fee if they do not take the 100,000 tons per year? How is that payment guaranteed? Does the BOS have to approve that expenditure every year, or can the long term lease/supply agreement bind them to that commitment? When will we be able to enter into the supply agreement to confirm all of this in writing?" Based on the other facts described in this affidavit, and the timing and context of this communication, I believe CONTRACTOR 4 was alerting HERNANDEZ to the issues he wanted to raise with NURU at dinner so NURU could help them finalize the supply contract for the asphalt plant on favorable terms.

102.     CONTRACTOR 4's credit card statement shows a charge from RESTAURANT 1 dated August 23, 2017 in the amount of $1,696.29.  I believe this charge was for the dinner on August 21, 2017 described above.

103.     On November 16, 2016, NURU emailed HERNANDEZ a bill from Home Depot regarding replacement doors. The amount was approximately $1,400. NURU wrote: "I think this was meant for you, as we discussed yesterday on the phone. Okay, thanks."

104.     On November 28, 2017, HERNANDEZ texted CONTRACTOR 4 and asked: "Do we need to meet with our friend?..." CONTRACTOR 4 responded: "Yes, let's schedule next week…"

105.     On November 30, 2017, HERNANDEZ texted NURU: "We are in the back room." Credit card records for CONTRACTOR 4 show a charge of $1,543.76 at RESTAURANT 1 on the same day.

106.     The materials I have reviewed, including text messages, emails, intercepted phone calls and credit card records, indicate the pattern of dinners with HERNANDEZ, CONTRACTOR 4 and NURU at RESTAURANT 1 continued through at least early 2019 and likely later, all while negotiations

on the asphalt plant continued without full resolution.

### E.   The Tractor

107.   In connection with the same bribery scheme concerning the asphalt plant, and similar to the expenditure on the patio doors and windows described above, HERNANDEZ also coordinated the delivery of a tractor to NURU at his ranch property in Lodoga. Based on my review of business records and publicly available data, I believe the tractor and attachments delivered to NURU in February 2019 are worth in excess of $40,000.  Based on my review of business records, the tractor also appears to have been financed through one of CONTRACTOR 3 and CONTRACTOR 4's companies.

108.   On February 7, 2019 at approximately 4:32 PM, NURU called HERNANDEZ. HERNANDEZ told NURU that he "spoke with [CONTRACTOR 3 first name] [10] and the John Deere is ready. You need to give me two days, available days, on weekdays in the next two weeks, he uh, John Deere have to deliver and teach you how to operate it, so you need to give me two days and they'll pick one of those days to make it work for you."

109.   On February 11, 2019, at approximately 11:28 AM, NURU called HERNANDEZ. HERNANDEZ confirmed NURU would be at his vacation home on the following Tuesday and Wednesday so he could receive the delivery of what was later confirmed to be a John Deere tractor. During the exchange, NURU also said he thought it was better if HERNANDEZ dealt directly with who I believe to be CONTRACTOR 3 and CONTRACTOR 4:

> NURU: Okay. That's good, I got that down. And then, let them know I picked those two days, so I'll be up there. I took Tuesday off, so I'll be up there, so.
>
> BH: Okay, yeah, I'm trying to confirm that, it's just, this guy's hard to pin down man, so.
>
> NURU: I know, I know. That's why, better you deal with them because I - yeah, so, yeah, um, yeah so I'll be there. you know, I'll go Saturday night and I'll stay there until Tuesday.
>
> BH: Okay.

110.   On February 13 and 15, 2019, NURU and HERNANDEZ spoke by phone and confirmed the delivery of the tractor at noon on February 18, 2019.

111.   On February 18, 2019, NURU texted a photo of a John Deere tractor being unloaded

---

[10] Based on other intercepts, agents believe this is a reference to CONTRACTOR 3.

1    from a truck and wrote "Works begins at the ranch."

2       112.    On the same day he texted CONTRACTOR 3 "Thank You."  He also called

3    CONTRACTOR 3 at approximately 11:56 AM:

4               NURU: Mr. [CONTRACTOR 3 first name].

5               C3: Hey how are you?

6               NURU: Man did you see that brother? very nice very very nice

7               C3: Ok good

8               NURU: Yeah beautiful machine

9    After discussing how beautiful NURU's new tractor was, CONTRACTOR 3 said "I am going to make

10   another trip um probably next week to bring the attachments….so I got one more attachment that is a

11   bore attachment, another attachment that is a grading attachment for spreading rock and leveling things,

12   ok, I'm glad they made it over there." NURU responded "Nice, nice. I just finished my training course

13   (laughs)" and CONTRACTOR 3 replied "Good. That is the only reason I wanted to coordinate.

14   Otherwise, I wouldn't have told them to deliver it, but uh, there are a few things that need to be, go over,

15   and how things connect and that stuff."

16      113.    The two then ended their conversation with CONTRACTOR 3 indicating they would talk

17   again soon (as described below, it appears the group met at RESTAURANT 1 two days later):

18               NURU: Ok nice nice nice Ok ok just wanted to say thank you so much. I'll send you a

19                    picture. It's got a a nice house in my ranch where I am going to keep it. I will send you

20                    the picture right now. You see it in the garage haha

21               C3: Awesome that is good. It's got air conditioning right?

22               NURU: Oh yeah its beautiful air condition and heater. Oh yeah man its good. Work now.

23                    No excuse now but to work. We can work now haha

24               C3: Good alright Mohammed. Have a great day. Enjoy your day. Glad that thing showed

25                    up and uh

26               NURU: Thank you

27               C3: We will talk shortly

28      114.    NURU had a similar conversation with HERNANDEZ the following day, February 19,

AFFIDAVIT                                    24

2019, at approximately 7:46 AM.  The two of them discussed NURU's new tractor and HERNANDEZ asked if NURU was happy with it. NURU responded "Yeah, yeah, very nice. It's a nice tractor. Very nice, you know, it's a modern tractor for sure."

115.    The following day, February 20, 2019, HERNANDEZ texted NURU: "Are we on for dinner tonight?"  NURU responded "Yes."  They also spoke by phone after NURU returned HERNANDEZ's call:

> NURU: Hey, so tonight what time?
>
> BH: Uhh 7, 7:30, what time do you want?
>
> NURU: 7:30 okay, okay, I got it.
>
> BH: Yeah [CONTRACTOR 4 first name] wants to confirm that's all
>
> N: Okay, okay, alright, alright.
>
> BH: Alright, we'll see you there

116.    Consistent with the pattern established above, credit card records show a charge to CONTRACTOR 4's credit card at RESTAURANT 1 for $716.80 on the same day.

117.    Two days later, NURU called HERNANDEZ and referenced what I believe to be the dinner meeting and asphalt plant negotiations:

> BH:        I'll be around this weekend ya know, Sunday uh, we can get together for a little
>            bit if you have time I mean you're not tired. Get together for drinks or something?
>
> NURU:      Okay. Alright that sounds (talking over each other)
>
> BH:        I'll be around.
>
> NURU:      Okay, alright, yeah. I'm good.
>
> BH:        Let me know. (UI) that was a good meeting this week, I think we had a good
>            meeting, so. (talking over each other) (UI) pick up those meetings and continue
>            moving.
>
> NURU:      Let me, I'm working to find out from [] why is it taking so long, ya know?
>
> BH:        Yeah.
>
> NURU:      You know they keep on saying when [CONTRACTOR 4 first name] changes the
>            site or (UI), but I'll find out what's going on.

1  BH:          Okay.

2  NURU:        Yep, we're good. We're good. Yeah.

3  Based on the timing and the context of this call, and the pattern described above, I believe NURU had

4  dinner with HERNANDEZ and CONTRACTOR 4 on February 20, 2019, shortly after delivery of the

5  tractor, to again discuss the asphalt plant and how NURU could help them resolve the still ongoing

6  negotiations with the Port and DPW, which had at this point been dragging on for several years.

7  **F.      The January 27, 2018 Bribe**

8  118.    The January 27, 2018 bribe alleged in this Complaint is part of the larger course of

9  conduct and years-long bribery scheme described above.

10  119.    On January 16, 2018, NURU forwarded HERNANDEZ an email from BUILDING

11  MATERIALS STORE 1 attaching an updated invoice/sales order for $51,918.10 for tile and stone and a

12  credit card authorization form. NURU wrote "any help will be very much appreciated. Thank you and

13  God Bless."

14  120.    At this point, NURU had already provided inside information to HERNANDEZ

15  concerning the asphalt plant and been wined and dined numerous times by CONTRACTOR 4 and

16  HERNANDEZ.  NURU had also been receiving tens of thousands of dollars in labor and materials for

17  his ranch property in Lodoga, and been told by HERNANDEZ "Bring me some blessings. I need some

18  jobs." The pattern of bribes was well established.

19  121.    Six days later, on January 22, 2018, NURU forwarded HERNANDEZ a list of upcoming

20  City bid projects for the next 3-5 months.  He first forwarded the email, which he received from another

21  DPW employee (Subject: "FW: list of building projects bidding in the next 3-5 months") from his DPW

22  email account to his personal account before forwarding it to HERNANDEZ. One of the projects listed

23  in the attachment was the Guy Place Mini Park which was estimated for advertising on January 18, 2018

24  with a cost of $2 million.

25  122.    Five days later, on January 27, 2018, HERNANDEZ texted NURU a photo of an invoice

26  from BUILDING MATERIALS STORE 1 that covered the same materials and amount that NURU had

27  sent on January 16, 2018.  The total was again $51,918.10. In the text HERNANDEZ wrote "Paid, it

28  will be about 4 weeks. [INDIVIDUAL 1] will try to expedite the order and will provide an update next

week."[11]

123.    About three weeks later, on February 20, 2018, HERNANDEZ forwarded an internal City email chain to NURU's personal email address and wrote "I need your help." The subject of the forwarded chain was "Guy Place Mini Park." The email chain concerned internal city communications about current bids and the fact that neither AzulWorks nor its subcontractor had the appropriate technical license.

124.    One DPW employee wrote in the chain: "At this point Azul cannot add any new subcontractors and I don't think we can request that Azul find an alternative as this would create an unfair bidding advantage. Typically, when a subcontractor that is listed to perform work is deemed ineligible due to whatever reasons, the prime contractor would have to agree that they are qualified to perform the work themselves."

125.    Another senior city employee then forwarded the email chain to HERNANDEZ writing "This is urgent." At that point HERNANDEZ emailed NURU: "Need your help."  It is unclear what NURU did, but publicly available data (http://openbook.sfgov.org/) indicates AzulWorks was ultimately awarded the contract (No. 1000006022) and was paid $487,588 from the City in FY 2018-2019 and $1,442,448 in FY 2019-2020.  There is $511,574 outstanding according to the same website.  Internal AzulWorks emails corroborate the contract award.

126.    Based on the above, I respectfully submit probable cause exists to believe that, after establishing a continuing course of conduct in which tens of thousands of dollars in labor and material were provided to NURU in exchange for his assistance with public contracts and City approvals as the Director of DPW, HERNANDEZ again bribed NURU with tens of thousands of dollars' worth of tile and stone for NURU's vacation home.  The bribe translated into NURU saving AzulWorks' bid for a multi-million dollar project for which it had submitted an unqualified bid.  Based on publicly available

---

[11] HERNANDEZ appears to have wanted NURU to think he spent more than he did on the bribe. Business records from AzulWorks contain a copy of the same invoice that was texted to NURU with the handwritten notation "Ret."  In the same file, however, is another invoice with the same order number on the same date for $34,070.49 along with a credit card receipt for the same amount.  I believe this deception confirms HERNANDEZ was trying to influence or reward NURU in connection with NURU's official action.  There would be no need to inflate the amount spent if this was simply intended as a gift among friends.

1    data, that project has since provided HERNANDEZ's company with total payments from the City of

2    $1,930,036 (http://openbook.sfgov.org/).

3 **V.**     **CONCLUSION**

4        127.     Based on the foregoing facts and my training and experience, I respectfully submit there

5    is probable cause to believe that HERNANDEZ bribed NURU, in violation of Title 18, United States

6    Code, Sections 666(a)(1)(B) and 2, intending to influence and reward NURU in connection with a

7    transaction and series of transactions of the City and County of San Francisco involving $5,000 or more.

8 **VI.**    **REQUEST FOR SEALING**

9        128.     Because this investigation is continuing, disclosure of the Complaint, this affidavit,

10    and/or the arrest warrant will jeopardize the progress of the investigation.  Disclosure would give the

11    targets of the investigation an opportunity to destroy evidence, change patterns of behavior, notify

12    confederates, or flee from prosecution.  Accordingly, I request that the Court issue an order sealing the

13    Complaint, this affidavit, and the arrest warrant until further order of the Court.

14

15

16                        s/

17                        JAMES A. FOLGER

                       Special Agent, Federal Bureau of Investigation

18

19 Sworn to before me over the telephone and signed

20 by me pursuant to Fed.R.Crim.P 4.1 and 4(d)

   this  _3rd_  day of June, 2020.

21

22

23 HON. JOSEPH C. SPERO

   Chief Magistrate Judge

24

25

26

27

28